Del DIETRICH, Plaintiff,

v.

Richard BAUER; Groupe Scorpion, B.V.; Jack T. Dawson; Green–Cohn Group; Morton Cohn; Van D. Greenfield; Leonard Schwalb; CS First Boston; Bear Stearns; Smith Benton & Hughes, Inc.; Michael Zaman; Claudia Zaman; Emmet A. Larkin & Company; Painewebber; Oppenheimer & Co., Inc.; Edward Fisch; Barry Witz; Mario V. Andrade; Westfield Financial Corporation; Idata, Inc.; Robert Bogutski, and Kathleen Bogutski, Defendants.

No. 95 Civ. 7051(RWS).

United States District Court, S.D. New York.

March 4, 1999.

Goodkind, Labaton Rudoff & Sucharow, New York City, James W. Johnson, of counsel, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, Richard M. Heimann, of counsel, Starr & Holman, New York City, Zachary Alan Starr, of counsel, for Plaintiff.

Joseph W. Ryan, Attorney for Defendant Jack T. Dawson, Uniondale, Berliner Cohen, Attorney for Defendant Jack Dawson, San Jose, CA, Jonathan D. Wolf, of counsel, Rosenman & Colin, Attorney for Defendants Green–Cohn Group Inc., Morton Cohn, Van D. Greenfield, Leonard Schwalb and Bear Stearns, New York City, Arthur S. Linker, Howard A. Fischer, of counsel, Shearman & Sterling, Attorney for Defendant CS First Boston Corp., New York City, Stephen R. Fishbein, Jordana B. Merlis, of counsel, Einhorn & Edgerton, Attorney for Defendants Michael Zaman, Claudia Zaman and Smith, Benton & Hughes, Inc., Los Angeles, CA, Irving M. Einhorn, of counsel, Howard, Smith & Levin, Attorney for Defendant PaineWebber Inc., New York City, C. William Phillips, Barbara Hoffman, of counsel, Schulte Roth & Zabel, Attorney for Defendant Oppenheimer & Co., New York City, Howard O. Godnick, Jonathan Taylor, Thomas Fallati, of counsel, Tenzer Greenblatt, Attorney for Defendant Barry Witz, New York City, James G. Greilsheimer, Lawrence S. Feld, of counsel, for Defendants.

## OPINION

SWEET, District Judge.

In this proposed class action, plaintiff Del Dietrich ("Dietrich") has moved for appointment of additional class representatives. Defendant Barry Witz ("Witz") has moved for reconsideration of an order extending Dietrich's time to serve him with the amended complaint and for dismissal of the amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity. Defendants Jack T. Dawson ("Dawson"), Green–Cohn Group ("Green–Cohn"), Morton Cohn ("Cohn"), Van D. Greenfield ("Greenfield"), Leonard Schwalb ("Schwalb"), CS First Boston Corporation ("CS First Boston"), Bear Stearns & Co., Inc. ("Bear Stearns"), Smith Benton & Hughes, Inc. ("SB & H"), Michael Zaman, Claudia Zaman (together with Michael Zaman, the "Zamans"), PaineWebber Incorporated ("PaineWebber") and Oppenheimer & Co., Inc. ("Oppenheimer") (collectively, and together with "Witz," the "Defendants"), have also moved pursuant to Rules 12(b)(6) and 9(b) for dismissal of Dietrich's amended complaint.

For the reasons set forth below, Dietrich's motion for additional class representatives is denied, as is Witz's motion for reconsideration, and the Defendants' motions to dismiss will be granted in part and denied in part.

Specifically, the claims brought pursuant to (1) Section 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. § 77$l$(1), (2) (the "1933 Act"), along with its California state counterparts; (2) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"); (3) negligent misrepresentation; (4) and sections 17200 et seq. of the California Business Professions Code are dismissed as to all the Defendants. As to the primary liability claims brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "1934 Act"), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, and common law fraud, the motions to dismiss of Dawson, Cohn, Greenfield, Schwalb, Bear Stearns, Oppenheimer, PaineWebber, the Zamans, and Witz are granted, and those of Green–Cohn and SB & H are denied. The motions to dismiss claims alleging controlling person liability under Section 20(a) of the 1934 Act, 15

U.S.C. § 78t(a), on the part of Greenfield, Cohn, and the Zamans are denied. CS First Boston's motion to dismiss the Section 10(b), Rule 10b–5, and common law fraud claims is granted in part and denied in part; any claim against CS First Boston for participation in the Regulation S scheme is dismissed, whereas the claim alleging participation in the market manipulation scheme is sustained.

In accordance with this decision, Dietrich will be given leave to replead certain of the dismissed claims.

### Parties

Dietrich, a resident of Campbell, California, invested in the common stock of Scorpion Technologies ("Scorpion").

Defendant Richard Bauer has been a director of Scorpion since February 1989 and its chief executive officer and chairman of the board since September 1993. Bauer is also chief executive officer of Groupe Scorpion, B.V. ("Groupe Scorpion").

Defendant Groupe Scorpion, a Dutch company, is a wholly owned foreign subsidiary of Scorpion.

Dawson is an attorney who provided services for Scorpion.

Green–Cohn is a brokerage firm located in New York, New York.

Cohn is the owner of Green–Cohn.

Greenfield is the president of Green–Cohn.

Schwalb is the chief financial officer of Green–Cohn.

CS First Boston is a brokerage firm whose principal offices are located in New York, New York.

Bear Stearns is a brokerage firm whose principal offices are located in New York, New York. It acted as the clearing broker for Green–Cohn's transactions.

SB & H, whose offices are located in Englewood, Colorado, is a brokerage firm registered with the Securities and Exchange Commission ("SEC") since October 5, 1987.

Michael Zaman is president of SB & H.

Claudia Zaman is a financial principal of SB & H.

Defendant Emmet A. Larkin & Company ("Emmet Larkin") is a brokerage firm with offices in San Francisco, California.

PaineWebber is a brokerage firm whose principal offices are located in New York, New York.

Oppenheimer is a brokerage firm whose principal offices are located in New York, New York.

Defendant Edward Fisch maintains offices in Century City, California, and purportedly performed investment banking services for Scorpion in 1991.

Witz maintains offices in Century City, California, and allegedly performed investment banking services for Scorpion in 1991.

Defendant Mario V. Andrade, a resident of Bolivia, is the chairman of the board of Saturn Enterprises, Ltd. ("Saturn").

Defendant IData, Inc. is a transfer agent located in Dallas, Texas, and has served as Scorpion's transfer agent since May 1992.

Defendant Robert Bogutski is president of IData, Inc.

Defendant Kathleen Bogutski is secretary, treasurer, and manager of IData, Inc.

Defendant Westfield Financial Corporation ("Westfield Financial") is a brokerage firm whose principal offices are located in New York.

### Prior Proceedings

In this action, filed on August 28, 1995, Dietrich alleges violations of Section 12(1) and 12(2) of the 1933 Act; Section 10(b) of the 1934 Act; Rule 10b–5; RICO; sections 25110, 25130, 25401, 25501, 25503, and 25504.1 of the California Corporations Code; and sections 17200 *et seq.* of the California Business Professions Code.

Dietrich also brings related claims for common law fraud and negligent misrepresentation. Finally, of the Defendants at issue, Dietrich seeks to hold Dawson, Cohn, Greenfield, and the Zamans as controlling persons under Section 20(a) of the 1934 Act.

By opinion dated December 10, 1996, the Honorable Lawrence M. McKenna dismissed the complaint with leave to replead. *See Dietrich v. Bauer*, No. 95 Civ. 7051, 1996 WL 709572 (S.D.N.Y. Dec.10, 1996). On February 10, 1997, Dietrich filed an amended complaint ("Amended Complaint"). The instant motions were filed as follows: PaineWebber filed its motion to dismiss the Amended Complaint on April 14, 1997; Oppenheimer, CS First Boston, Green–Cohn, Cohn, Greenfield, Schwalb, and Bear Stearns on April 15, 1997; Dawson joined in the motions on April 24, 1997; Dietrich filed its motion for appointment of seven additional class representatives June 6, 1997 [1]; and Witz filed its motion for reconsideration and dismissal on December 4, 1997.

On December 1, 1998, this action was reassigned to this Court pursuant to recusal by Judge McKenna upon discovery of a conflict. A pretrial conference was held on December 14, 1998, at which time the instant motions were considered fully submitted.

*Facts*

The facts in this action have been set forth in detail in a prior opinion by Judge McKenna, familiarity with which is assumed. *See Dietrich*, 1996 WL 709572, at *1–*4. Those facts relevant to the instant motion are set forth below.

In considering a motion to dismiss, the facts alleged in the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken primarily from the Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion.

This action is alleged to be brought on behalf of a class consisting of "[a]ll persons or entities who purchased or otherwise acquired shares of Scorpion securities during the period from and including May 13, 1992 through and including December 31, 1994." (Am.Compl.¶ 41.) According to Dietrich, he invested $2,275 in shares of Scorpion in September 1991, $1,033 in December 1992, and $1,131 in December 1993. Dietrich does not identify from whom he bought the Scorpion shares.

Dietrich alleges, *inter alia*, that the Defendants engaged in two separate but interrelated schemes perpetuated from 1992 through late 1994, involving the unlawful sale of unregistered stock issued by Scorpion ("Regulation S scheme") and the unlawful manipulation of the trading price of Scorpion stock ("Market Manipulation scheme") as a means to maximize the profits for the participants in the scheme. Dietrich contends that these interconnected fraudulent schemes allowed the Defendants not only to substantially increase the price of Scorpion stock, but also to distribute to unknowing purported class members stock that should not have been issued absent a filing with the SEC of a

---

**1.** On this date, Dietrich also filed a motion for class certification. On August 15, 1997, an order was filed deferring the class certification motion until determination of the motions to dismiss the Amended Complaint. The motion for class certification has not yet been briefed by the Defendants, and a sched- ule for that motion will be set after resolution of any motions to dismiss Dietrich's second amended complaint, if Dietrich files one. If Dietrich chooses not to replead the Amended Complaint, a schedule will be determined upon Dietrich's written statement to the Court that he will not replead.

registration statement for a secondary public offering.

## I. *Regulation S Scheme*

In 1991 and early 1992, Scorpion, a publicly traded corporation listed on the NASDAQ market under the symbol "SCPNA," sought to register a secondary offering of Class A common stock for public sale. To this end, in November 1991, Scorpion filed a registration statement with the SEC, and in January 1992, filed a first amendment to this statement. In February 1992, the SEC informed Scorpion that it was under investigation. Scorpion's officers withdrew their registration statement, recognizing that the SEC investigation would prevent Scorpion from obtaining SEC approval for the offering during the pendency of the investigation.

At the time that the registration statement was withdrawn, Scorpion, through its officers, directors, and others, developed and carried out, between May 1992 and late 1994, a plan to sell securities by issuing stock ostensibly pursuant to Regulation S—SEC rules governing offers and sales made outside of the United States without registration under the 1993 Act— but with the intention of causing the stock to be sold to United States purchasers through securities broker/dealers within the United States, thus avoiding registration under Section 5 of the 1933 Act.

Under this plan, Scorpion transferred its common stock to foreign entities controlled by the Defendants and other participants in the plan. The alleged foreign entities to whom Scorpion transferred stock include Mayfair Financial, FRM Commodities, Tanaka Capital, Mahsa Poust, Saturn, Wellcome Mason, Osicom Technologies, Inc., Pentasonic, S.A., Gerard Peron, and Unison, J.V. They are not defendants in this action. The sole function of these foreign entities was to re-transfer Scorpion common stock to broker/dealers within the United States for sale to the public. Generally, no payment was made by the foreign entities to whom the stock was issued

at the time of transfer. The foreign entities to which Scorpion issued Scorpion common stock did not publicly disclose their sale of the stock pursuant to Regulation D of the 1933 Act. Dietrich claims that the broker/dealers, including Bear Stearns, Green–Cohn, Emmet Larkin, SB & H, Oppenheimer, PaineWebber, and Westfield Financial, effectively functioned as underwriters and sellers of a secondary public offering.

## II. *Market Manipulation Scheme*

According to Dietrich, during the week of January 18, 1993, the Defendants, including CS First Boston, Bear Stearns, Green–Cohn, and SB & H, planned and carried out a scheme to defraud investors by artificially creating a market demand for Scorpion stock. The Defendants involved accomplished this through their trading activity and by creating false rumors of institutional interest in Scorpion stock and expected fourth quarter earnings of $.15/share. The result of the rumors and trading activity was that the Defendants were able to increase the demand for Scorpion common stock, tripling the market price. When the market opened on January 18, 1993, the stock was trading at a low of $.75/share. The trading volume for the prior ninety days was 350,000 shares. At approximately 2:30 p.m. Eastern standard time, Bloomberg's newswire reported a rumor of institutional buying of Scorpion stock. The total volume of trading for January 18, 1993, exceeded 5.7 million shares. On January 19, 1993, 4.1 million shares of Scorpion stock were traded, with an average price of $.75/share. On January 20, 1993, the Scorpion stock rose from $.78/share to $1.28/share with a volume of 6.6 million. At some point during the day of January 22, 1993, the stock peaked at over $2.00/share with a volume of over 5.5 million.

During the week of alleged manipulation, Dietrich also asserts that through a number of inter-Defendant trades, the Defendants were able to increase the report-

ed trading volume of the stock. According to Dietrich, this was due to wash transactions among the Defendants. Specifically, Dietrich asserts that on January 18, 1993, Saturn sold approximately 470,000 shares of stock through Green–Cohn and two Bear Stearns accounts, purportedly beneficially owned by principals of Green–Cohn, purchased approximately 447,000 shares. Additionally, at the same time SB & H was selling in excess of one million shares, CS First Boston was acquiring for ultimate sale in excess of one million shares.

Dietrich represents that the Regulation S and Market Manipulation schemes caused him injury, in that at the time Dietrich bought his shares of Scorpion common stock the true value was zero. Currently, the stock has no market and is valueless. Dietrich has not sold his interest in Scorpion.

*Discussion*

### I. *Dietrich's Motion for Appointment of Additional Class Representatives Is Denied*

By means of a motion to add class representatives, Dietrich seeks to designate seven additional proposed representatives in this litigation. The purpose, according to Dietrich, of the proposed intervention by these additional class members is the preservation and protection of the claims under Section 12(1) of the 1933 Act.

This motion is premature and without procedural foundation because no class has been certified. Dietrich wishes to add additional representatives to a class that does not exist. Indeed, Dietrich has not cited any controlling, or convincing, authority for the appointment of class representatives prior to certification of the alleged class that they would represent. In *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193 (S.D.N.Y.1992), cited by Dietrich, the court did allow an additional class representative to intervene, but only in connection with the certification of a class, which was conceded by the defendants in

that case to be appropriate and granted by the court. *See id.* at 197–203.

Dietrich seeks to bolster the Section 12 claims in his Amended Complaint by adding additional class representatives in order to withstand the current round of motions to dismiss, and then proceed—for the first time—to the class certification stage. However, Dietrich cannot salvage his Section 12 claims by contending that the proposed new representatives have standing to prosecute when they are not named as plaintiffs and when, as discussed below, he himself lacks standing to prosecute those claims. It is well established that a named plaintiff must have standing in order to sustain a claim, and as this Court has stated, "a plaintiff may not use the procedural device of a class action to bootstrap himself into standing he lacks under the express terms of the substantive law." *German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 548 (S.D.N.Y. 1995).

Dietrich's effort to add new class representatives in an effort to resuscitate his Amended Complaint is procedurally inappropriate, and his motion is therefore denied.

### II. *Witz's Motion to Vacate the Order Extending Time of Service Is Denied*

Witz moves for reconsideration of an order dated July 31, 1997 (the "Order"), extending Dietrich's time to serve Witz with the Amended Complaint, and for dismissal of the action against him because Dietrich did not serve him with the complaint within 120 days of the institution of the action as required by Rule 4(m) of the Federal Rules of Civil Procedure. According to Witz, he has been prejudiced by the late service of the complaint because Terry Marsh ("Marsh"), President and Chief Executive Officer of Scorpion, was indicted approximately a year after the commencement of this action and has advised that because of the pending indictment against

him, he would decline now to testify in this action on Fifth Amendment grounds.

■ Witz's reconsideration motion is governed by Local Rule 6.3, which provides, in pertinent part: "There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Thus, to be entitled to reconsideration, the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion. *See Ameritrust Co. Nat'l Ass'n v. Dew,* 151 F.R.D. 237, 238 (S.D.N.Y.1993); *Fulani v. Brady,* 149 F.R.D. 501, 503 (S.D.N.Y.1993), *aff'd sub nom. Fulani v. Bentsen,* 35 F.3d 49 (2d Cir.1994); *East Coast Novelty Co. v. City of New York,* 141 F.R.D. 245, 245 (S.D.N.Y.1992); *B.N.E. Swedbank, S.A. v. Banker,* 791 F.Supp. 1002, 1008 (S.D.N.Y. 1992); *Novak v. National Broadcasting Co.,* 760 F.Supp. 47, 48 (S.D.N.Y.1991); *Ashley Meadows Farm, Inc. v. American Horse Shows Ass'n,* 624 F.Supp. 856, 857 (S.D.N.Y.1985).

■ Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. *See American Alliance v. Eagle Ins.,* 163 F.R.D. 211, 213 (S.D.N.Y.1995) (citing *Caleb & Co. v. E.I. DuPont De Nemours & Co.,* 624 F.Supp. 747, 748 (S.D.N.Y.1985)). In deciding a reconsideration motion, the Court must not allow a party to use the motion as a substitute for appealing from a final judgment. *See Morser v. AT & T Information Sys.,* 715 F.Supp. 516, 517 (S.D.N.Y.1989); *Korwek v. Hunt,* 649 F.Supp. 1547, 1548 (S.D.N.Y.1986), *aff'd,* 827 F.2d 874 (2d Cir.1987). Therefore, a party may not "advance new facts, issues or arguments not previously presented to the court." *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.,* 768 F.Supp. 115, 116 (S.D.N.Y.1991); *see Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* No. 86 Civ. 6447, 1989 WL 162315, at *3 (S.D.N.Y.

Aug.4, 1989). The decision to grant or deny the motion is within the sound discretion of the district court. *See Schaffer v. Soros,* No. 92 Civ. 1233, 1994 WL 592891 (S.D.N.Y. Oct. 31, 1994).

Because Witz's motion does not present "matters or controlling decisions the court overlooked that might materially have influenced its earlier decision," *Morser,* 715 F.Supp. at 517, the motion is denied.

In the Order, Judge McKenna granted Dietrich's motion for an extension of time to effectuate service of the summons and complaint on Witz. Rule 4(m) provides, in relevant part, that:

> If the service of the summons and complaint is not made upon the defendant within 120 days of filing the complaint, the court, upon its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant *or direct that service be effectuated within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.*

Fed.R.Civ.P. 4(m) (emphasis added).

■ Pursuant to the Rule, where a party shows "good cause" for his failure to effect service within 120 days of filing, the Court *must* extend the time for service for an appropriate period. If "good cause" is not shown, then the Court may either dismiss the action or order service within a specified period of time. *See Landy v. Irizarry,* 884 F.Supp. 788, 793 (S.D.N.Y. 1995). In assessing whether good cause exists for late service, consideration is made as to whether the plaintiff has made reasonable efforts to effect service and whether the defendant will suffer prejudice from the delay. *See National Union Fire Ins. v. Barney Assoc.,* 130 F.R.D. 291, 293 (S.D.N.Y.1990).

■ Submissions by Witz fail to demonstrate that Dietrich's efforts to effectuate service lacked diligence. *See generally*

*United States v. Ayer,* 857 F.2d 881, 885 (1st Cir.1988); *Landy,* 884 F.Supp. at 793 n. 7. Moreover, Witz has not established that he has been prejudiced by late service.

Witz's prejudice argument is based upon his assertion that prior to the filing of a criminal indictment against Marsh, the former President and Chief Executive Officer of Scorpion, in August 1996, Marsh would have been willing to testify in the pending action if subpoenaed to appear at a deposition or a trial. Witz claims that Marsh's testimony "would serve to establish that the alleged scheme and plan to evade the registration provisions of the federal securities laws and to evade Regulation S never existed." (Witz Decl. ¶ 4.) According to Witz, Marsh told him that, because of the indictment, Marsh would invoke his constitutional privilege against self-incrimination with respect to all matters relating to Scorpion if he were *now* subpoenaed to testify.

Witz's prejudice argument fails because Marsh's purported offer of exculpatory testimony is inadmissible hearsay. Moreover, Witz fails to explain exactly what Marsh's testimony would have been, or how it would have exculpated Witz. Finally, it is unclear—Dietrich suggests false— that Marsh would have been willing to testify in this action prior to his criminal indictment in August 1996. Marsh invoked his Fifth Amendment privilege against self-incrimination at least as early as February 23, 1995, when he was deposed in federal litigation in California involving Scorpion.

Accordingly, Witz's motion for reconsideration is denied.

### III. *Legal Standards for the Motions to Dismiss*

#### A. *Rule 12(b)(6)*

In deciding the merits of a motion to dismiss for failure to state a claim, all material allegations composing the factual predicate of the action are taken as true,

for the court's task is to "assess the legal feasibility of the complaint, not assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir. 1984) (*quoting Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). Thus, where it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would warrant relief, the motion for judgment on the pleadings must be granted. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Additionally, on a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the complaint, "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *see Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991). Matters suggested in Dietrich's opposing papers that interpret allegations in the Amended Complaint broadly or facts that are offered but that do not appear in the Amended Complaint will not be considered. *See Sheppard v. TCW/DW Term Trust 2000,* 938 F.Supp. 171, 178 (S.D.N.Y.1996) (explaining that the court could not consider allegations contained in plaintiffs' opposition to defendants' motion to dismiss but could only consider allegations within the complaint); *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 229 (S.D.N.Y. 1989) (stating that "it is axiomatic that the complaint cannot be amended by the briefs in opposition to a motion to dismiss").

### B. *Rule 9(b)*

Rule 9(b) of the Federal Rules of Civil Procedure requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir.1993); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See Di Vittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse*, 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd*, 936 F.2d 674 (2d Cir.1991).

The Court of Appeals has required that allegations of fraud specify adequately the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992); *Cosmas*, 886 F.2d at 11.

Not all elements of fraud need be pleaded with equal particularity, however. *See In re Blech Sec. Litig.*, 961 F.Supp. 569, 580 (S.D.N.Y.1997) [hereinafter *Blech II* ]. For example, allegations of scienter are not subject to the same exacting scrutiny applied to the other components of fraud, such as direct participation. *See id.* Scienter can be alleged by conclusory allegations if they are supported by facts giving rise to a strong inference of fraudulent intent. *See IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir.1993). The inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *see Time Warner*, 9 F.3d at 268–69.

Additionally, this Court has also noted that, in a complaint alleging market manipulation under Section 10(b), where the exact mechanism of the scheme is likely to be unknown to the plaintiff, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation. *See Blech II*, 961 F.Supp. at 580; *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1291 (S.D.N.Y.1996) [hereinafter *Blech I* ]. The complaint must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.*

When, as in this case, a complaint is made against multiple defendants, "the pleading must give notice to *each* defendant of its alleged misconduct." *Id.* at 1292 (emphasis added). This requirement exists because each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged. *See id.* at 1292–93 (*citing Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 584 (S.D.N.Y. 1995)); *see also Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.Supp.2d 275, 286 (S.D.N.Y.1998). Without this requirement, the policies of giving fair notice to, and protecting the reputation of, each defendant would be frustrated—parties might be improperly swept into the discovery stage of a litigation with other parties against whom fraud has been properly alleged. As a result, Rule 9(b) is not satisfied by a complaint in which " 'defendants are clumped together in vague allegations.' " *Blech I*, 928 F.Supp. at 1294 (quoting *Three Crown Ltd. Partnership v.*

*Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993)).

## IV. *Dietrich's Section 12(1) and (2) Claims Are Dismissed*

The Amended Complaint alleges violations of Section 12(1) and (2) of the 1933 Act. These claims allege that the "Selling Defendants" sold Scorpion securities without a registration statement. The term "Selling Defendants" is defined as follows:

In connection with the scheme and transactions described above [to sell unregistered securities], Defendants Green–Cohn; Bear Stearns; SB & H; Westfield Financial; and Emmet Larkin (the "Selling Defendants") functioned as "sellers" of securities for purposes of Section 12(1) and 12(2) of the Securities Act, 15 U.S.C. § 77*l*(1) and (2).

(Am.Compl.¶ 79.)

Section 12 of the 1933 Act, 15 U.S.C. § 77*l*, provides that:

Any person who (1) offers or sells a security in violation of Section 5 [15 U.S.C. § 77e], or (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . shall be liable to the person purchasing such security from him.

The United States Supreme Court has held that the purchaser of unregistered securities under Section 12 has a cause of action only against the person or entity who sold, offered, or actually solicited an offer to buy those securities to him. *See Pinter v. Dahl,* 486 U.S. 622, 643, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Thus, under *Pinter,* the imposition of liability pursuant to Section 12(1) requires proof of "a buyer-seller relationship, not unlike traditional contractual privity." *Id.* at 642,

108 S.Ct. 2063. As a result, Section 12(1) imposes liability on only the buyer's immediate seller and remote purchasers are precluded from bringing actions against remote sellers. *See id.* at 644 n. 21, 108 S.Ct. 2063.

Additionally, it is not enough simply to allege that one acquired the securities through the defendant, or that the defendant made the sale of securities possible. *Cf. id.* at 654, 108 S.Ct. 2063 ("Being merely a 'substantial factor' in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under § 12(1)"). Rather, facts must also be alleged establishing that the defendant was the "seller" of the securities within the meaning of Section 12—*i.e.,* either that the defendant was the title-holder of the securities prior to sale, *see id.* at 642, 108 S.Ct. 2063, or that the defendant, acting as agent, successfully solicited the plaintiff's purchase from the title-holder. *See id.* at 646, 108 S.Ct. 2063.

Among the defects found in the pleading of the Section 12(1) claim in the original complaint was the fact that plaintiff had failed to allege "when and from whom he purchased the [Scorpion] stock." *Dietrich,* 1996 WL 709572, at *5. Although Dietrich now has alleged when he purchased his stock—namely, September 1991, December 1992, and December 1993—Dietrich still has not stated from whom he purchased the shares. Although required by Section 12, the Amended Complaint fails to allege that the Scorpion stock purchased by Dietrich was either sold, offered, or actively and successfully solicited by any of the Defendants. This omission is fatal to Dietrich's First Claim, brought under Section 12(1) of the 1933 Act.

Under Section 12(2), a defendant may be held liable when misstatements or omissions occur in a "prospectus or oral communication." 15 U.S.C. § 77*l*(2). The Supreme Court has held that a Section 12(2) claim must be based on a prospectus,

which is defined as "documents related to public offerings by an issuer or its controlling shareholders," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), or in an oral communication that relates to a public written communication, such as a prospectus. *See id.* at 567–68, 115 S.Ct. 1061.

Nowhere in the Amended Complaint does Dietrich allege the existence of a "prospectus" or any other document which sets forth the information required in a prospectus. Moreover, Dietrich does not allege any oral statements made by the Defendants which relate to a prospectus. Indeed, Dietrich acknowledges that the Defendants' submissions in support of the motion to dismiss the Section 12(2) claim comport with the prior decision and asserts that the claim is realleged solely to protect fully his interests on any potential appeal. Thus, the Second Claim of the Amended Complaint, brought pursuant to Section 12(2), is hereby dismissed.

### V. *Dietrich's Section 10(b) and Rule 10b–5 Claims Are Dismissed in Part*

Section 10 of the 1934 Act makes it unlawful for any person ... (b) [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, a general anti-fraud provision, promulgated by the SEC in 1942 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In order to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege that " 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff's] injury.' " *Time Warner*, 9 F.3d at 264 (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985)); *accord Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

The Third Claim of the original complaint, alleged under Section 10(b) of the 1934 Act and Rule 10b–5, was dismissed for three reasons: (1) the failure to allege facts relating to Dietrich's discovery of the alleged fraud, *see Dietrich*, 1996 WL 709572, at *8; (2) the failure to adequately allege loss, *see id.* *8–*9; and (3) the failure to adequately allege affirmative misrepresentations pursuant to Rule 9(b), with the exception that it was found that "[p]laintiff's Section 10(b) market manipulation claim, which does not depend entirely on affirmative misrepresentations, is sufficiently individualized with regard to Defendant's CS First Boston's and Green Cohn's alleged participation in a market manipulation scheme." *Dietrich*, 1996 WL 709572, at *9–*10.

Dietrich's Amended Complaint now asserts two claims under Section 10(b): the Third Claim (Am.Compl.¶¶ 110–15), and

the Fourth Claim (Am.Compl.¶¶ 116–20), alleging, respectively, in Dietrich's characterization:

> two separate but interrelated fraudulent schemes perpetrated from 1992 through late 1994, involving the unlawful sale to class members of unregistered stock issued by Scorpion, a publicly held Colorado corporation, and the unlawful manipulation of the trading price of Scorpion stock as a means to maximize the illicit profits for the participants in the scheme.

(Pl.'s Mem. at 3.) As indicated above, the first of these schemes, alleged in the Third Claim, will be referred to as the Regulation S scheme, and the second scheme, alleged in the Fourth Claim, will be referred to as the Market Manipulation scheme.

The Defendants assert that the Third and Fourth Claims should be dismissed on the following grounds: failure to plead fraud with particularity as required by Rule 9(b); failure to state a claim upon which relief can be granted due to the inadequate pleading of scienter, transaction causation, and loss causation; and failure to comply with the statute of limitations. Although Dietrich's action is not time-barred and he has alleged transaction and loss causation sufficiently, Dietrich has not pleaded scienter, as to certain of the Defendants, adequately or in compliance with Rule 9(b). Moreover, the full range of Dietrich's allegations under Section 20(a), holding as controlling persons certain individual defendants, cannot be maintained.

### A. *Rule 9(b), Scienter, and Control Person Liability*

#### 1. *Regulation S Scheme*

According to Dietrich, the Regulation S scheme commenced in approximately May 1992 and continued through late 1994. The Defendants alleged to have participated in this scheme are Dawson, Green–

Cohn, Cohn, Greenfield, Schwalb, Bear Stearns, SB & H, the Zamans, Oppenheimer, PaineWebber, and Witz. Of these Defendants, Dietrich represents that Dawson, Green–Cohn, Cohn, Greenfield, Schwalb, S & H, the Zamans, and Witz were involved in devising the scheme.

In addition to allegations of primary violations of Section 10(b) and Rule 10b–5 by the participants of the scheme, Dietrich alleges controlling person liability under Section 20(a) of the 1934 Act as to Dawson, as controlling person of Scorpion and Groupe Scorpion; Cohn and Greenfield, as controlling persons of Green–Cohn;[2] and the Zamans, as controlling persons of SB & H.

In *Dietrich*, the claim premised on the Regulation S scheme was dismissed "to the extent that it [was] relying on affirmative misrepresentations, because [Dietrich] failed to comply with Fed.R.Civ.P. 9(b)." *Dietrich*, 1996 WL 709572, at *9. It was found that Dietrich had not "sufficiently individualized allegations regarding affirmative misstatements." *Id.* Dietrich has not remedied this defect. However, his claim focuses on the selling of, and utilizing in a scheme to defraud, unregistered securities. According to Dietrich, the participating Defendants engaged in transactions with the intent that those transactions appear to comply with the requirements of Regulation S, but their true purpose was to sell Scorpion stock in the United States to the public without registration. Dietrich urges that this deliberate intent, and elaborate implementation thereof, elevate the Defendants' conduct to the category of fraudulent schemes prohibited by Section 10(b) and Rule 10b–5.

In essence, it is the nondisclosure, and not affirmative misstatements, on which Dietrich's Third Claim is based. Pulling the wool over the eyes of investors as to the registration status of the securities and gaining from this deception may form a

**2.** The Amended Complaint does not assert controlling person liability as to Schwalb.

violation of Section 10(b) and Rule 10b–5. *See Securities & Exchange Comm'n v. Softpoint, Inc.*, 958 F.Supp. 846, 862–63 (S.D.N.Y.1997) ("By facilitating the sale of unregistered shares, [defendant] engaged in a course of business that deceived purchasers as to the legality of the stock issue and the financial stability of their investment. Thus, [defendant's] activities in the liquidation scheme fall within the scope of ... Section 10(b) and Rule 10b–5."), *aff'd*, 1998 WL 537522 (2d Cir. June 29, 1998). Yet alleging a sale of unregistered securities in and of itself without adequately pleading scienter, for instance, will not withstand a motion to dismiss. In the instant case, Dietrich successfully states a claim for primary liability against Green-Cohn and SB & H, and control person liability against Cohn, Greenfield, and the Zamans. As to Dawson, Schwalb, Bear Stearns, Oppenheimer, PaineWebber, Witz, and CS First Boston, Dietrich falls short of meeting Rule 9(b) requirements, sufficiently alleging scienter, or establishing control person liability.

### a. *Dawson*

The allegations in the Amended Complaint relied on by Dietrich as stating a claim against Dawson do not adequately plead a claim of a primary violation of Section 10(b) on his part. The controlling person allegations—that Dawson by virtue of his position as attorney exercised control over Scorpion and Scorpion Groupe—under Section 20(a) of the 1934 Act fail as well.

Section 20(a) of the 1934 Act imposes joint and several liability on any person who "controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a) (1995). To make out a *prima facie* case for control person liability, "a plaintiff must show a primary violation by the controlled person[,] ... control of the primary violator by the targeted defendant[,] ... and ... that the controlling person was in some meaningful sense a culpable participant in the fraud perpetuated by the controlled person." *S.E.C. v. First Jersey Sec.*, 101 F.3d 1450, 1472 (2d Cir.1996) (citations omitted). Furthermore, "control over a primary violator may be established by showing that [the controller] possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Id.* (quoting 17 C.F.R. § 240.12b–2). Actual control is essential to control person liability. *See Blech II*, 961 F.Supp. at 586 (*citing Ross v. Bolton*, 83 Civ. 8244, 1989 WL 80428, at *2 (S.D.N.Y. Apr.4, 1989) (stating that defendant must possess actual control over the transactions in question)).

In order to overcome a motion to dismiss at this stage, a plaintiff must plead facts which "support a reasonable inference that [the defendants] had the potential power to influence and direct the activities of the primary violator." *Food and Allied Service Trades Dep't, AFL–CIO v. Millfeld Trading Co.*, 841 F.Supp. 1386, 1391 (S.D.N.Y.1994); *see Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F.Supp. 587, 591 (S.D.N.Y.1990).

That Dawson is a lawyer for Scorpion does not, without more, mean that he controls Scorpion within the meaning of Section 20(a). *See generally Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir.1986). Where, as is the case with Dawson, "a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred, *e.g.*, that defendant had power, pursuant to an agreement to control the primary violator or aided the primary violator in performing some culpable conduct linking the defendant to the primary violation for which relief is sought." *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1378 (S.D.N.Y.1996); *see Barker*, 797 F.2d at 494 (explaining that an attorney's "ability to persuade and give counsel is not the same thing as 'control,' which almost al-

ways means the practical ability to direct the actions of the people who issue or sell securities").

The Amended Complaint does not allege such facts with respect to Dawson with the particularity required by Rule 9(b). Accordingly, the Third Claim is dismissed as to Dawson.

### b. *Green–Cohn*

The Amended Complaint alleges that Green–Cohn sold unregistered Scorpion stock.[3] Again, the sale of unregistered stock in the United States can constitute a violation of Section 10(b). *See Softpoint*, 958 F.Supp. at 862–63. The Amended Complaint also alleges facts from which scienter on the part of Green–Cohn can be inferred.

■ As previously noted, it is sufficient to allege facts establishing motive and opportunity to commit fraud or to allege facts constituting circumstantial evidence of conscious or reckless behavior to satisfy pleading scienter under Rule 9(b). *See Time Warner*, 9 F.3d at 268–69. "[G]reat specificity ... [is] not required with respect to ... allegations of knowledge and scienter." *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985).

■ As to Green–Cohn, Dietrich submits that it maintained and executed trades for foreign entities through which the Regulation S stock was transferred to the United States for sale to the public. The Regulation S stock was sold in the United States through Green–Cohn immediately upon the expiration of the waiting period during which Regulation S stock cannot be sold in the United States, or, in some instances, before such expiration. According to Dietrich, the sheer volume of the Regulation S stock—millions of shares at a time—that passed through Green–Cohn's hands indicated that the issuance and sale of the stock were not legitimate,

bona fide transactions. Additionally, as put by Dietrich, Green–Cohn knew, or at minimum, recklessly disregarded, indications that the Regulation S transactions in which it engaged violated the securities laws and regulations.

Dietrich has alleged sufficient facts to establish motive and opportunity on the part of Green–Cohn. For example, the Amended Complaint states that Green–Cohn maintained and executed trades on behalf of several foreign entities, including Mayfail Financial, FRM Commodities, and Saturn. Contrary to its standard policies and practices, Green–Cohn did not maintain any information about those entities except for their names and addresses, and had no financial or other information about them. The persons purporting to represent several of the foreign entitles with whom Green–Cohn dealt were the same individuals. Dietrich submits that Green–Cohn accepted without explanation the unlikely possibility that the same people would act on behalf of several ostensibly unrelated foreign entities seeking to sell large amounts of unregistered Scorpion stock in the United States. Moreover, the amounts received by Green–Cohn for executing Scorpion stock trades for the foreign entities were unusually large and far in excess of typical commissions for similar trades in other stock. Furthermore, contrary to standard practice, virtually no written agreements setting forth Green–Cohn's compensation for executing such trades existed between Green–Cohn and the foreign entities. Finally, Dietrich alleges that the participating Defendants, including Green–Cohn, divided the proceeds from the sales of the Regulation S stock.

Opportunity and financial motive have thus been established. Given the facts alleged in the Amended Complaint, Green–Cohn's motion to dismiss the Third Claim is denied.

---

3. The Amended Complaint also alleges that "either" Green–Cohn, Westfield Financial, or Oppenheimer sold other unregistered Scor-

pion stock. (*See* Am. Compl. ¶ 59.) This allegation does not satisfy Rule 12(b)(6).

### c. *Cohn, Greenfield, and Schwalb*

■ Dietrich represents that Cohn, Greenfield, and Schwalb participated in devising the scheme to evade the registration provisions of the federal securities laws. Yet conclusory characterizations set forth by words such as "devised" and "participated," without factual support, are insufficient under Rule 9(b). *See, e.g., Blech II,* 961 F.Supp. at 584. The Amended Complaint is devoid of any allegations forming a primary violation of Section 10(b) and Rule 10b–5 on the part of these defendants.

■ As to Cohn and Greenfield, however, the allegations that they are controlling persons of Green–Cohn sustain the instant motions. Cohn and Greenfield are alleged to be, respectively, the owner and the president of Green–Cohn, positions from which control "can be directly inferred without more." *Sloane Overseas Fund,* 941 F.Supp. at 1378.

Accordingly, claims of primary liability under Section 10(b) and Rule 10b–5 are dismissed as to Cohn, Greenfield, and Schwalb, and claims of controlling person liability pursuant to Section 20(a) remain as to Cohn and Greenfield.

### d. *Bear Stearns*

■ Bear Stearns is alleged both to have been the clearing broker for Green–Cohn's transactions and to have sold unregistered Scorpion stock. Bear Stearns' activity as clearing broker, standing alone, is not a ground for liability under Section 10(b). *See Blech II,* 961 F.Supp. at 584; *Blech I,* 928 F.Supp. at 1295–96; *Connolly v. Havens,* 763 F.Supp. 6, 10 (S.D.N.Y. 1991); *Dillon v. Militano,* 731 F.Supp. 634, 636 (S.D.N.Y.1990). Dietrich's response, that his claims against Bear Stearns are not based merely on the clearing services it performed but rather on allegations that Bear Stearns knowingly and recklessly worked with the other Defendants to bring Regulation S stock into the United States and sell it here, is not supported by the allegations in the Amended Complaint, all of which are conclusory, unparticularized, and factually unsupported.

Contrary to Dietrich's assertions, *Blech II* provides no support for his contention that he has asserted viable claims against Bear Stearns. In *Blech II,* this Court found insufficient the allegations which "characterize Bear Stearns' conduct as 'engaging in,' 'executing,' or 'entering into' fraudulent trades," because "[s]uch conclusory characterizations do not suffice when the factual allegations underlying those assertions are consistent with the normal activity of a clearing broker." *Blech II,* 961 F.Supp. at 584. It was explained that:

> Even assuming that Bear Stearns had knowledge of the Blech scheme, primary liability cannot attach when the fraudulent conduct that is alleged is no more than the performance of routine clearing functions. In other words, under Section 10(b), the act of clearing sham trades is not equivalent to causing or directing sham trades for the purpose of soliciting or inducing a plaintiff to purchase securities. The act of clearing sham trades alone, even with scienter, is not enough to show an attempt to unlawfully affect the price of such securities within the meaning of Section 10(b).

*Id.* at 584.

To be brought within Section 10(b), it also must be alleged that Bear Stearns "directly and knowingly participated in deceptive or manipulative conduct that caused damage to the [plaintiff]." *Id.* at 582. The Amended Complaint does not make such allegations as to Bear Stearns with the particularity required by Rule 9(b).

Although Dietrich alleges that Bear Stearns sold unregistered Scorpion stock, it does not allege facts from which scienter on the part of Bear Stearns can be inferred. Therefore, the Third Claim is dismissed as to Bear Stearns, pursuant to Rules 12(b)(6) and 9(b).

### e. *SB & H*

█ The Amended Complaint alleges that SB & H sold unregistered Scorpion stock. It also alleges facts from which scienter on the part of SB & H can be inferred.

Motive and opportunity have been established, in part, based on the allegations that SB & H, together with others, devised the scheme, engaged in transactions involving foreign entities where no payment was made by the foreign entities at the time of transfer, and received proceeds from the sale of stock to the public as a participant of the alleged scheme. Accordingly, the Third Claim will not be dismissed as to SB & H.

### f. *Michael Zaman and Claudia Zaman*

█ As with Cohn, Greenfield, and Schwalb, the Amended Complaint does not adequately plead a claim of a primary violation of Section 10(b) on the part of Michael Zaman or Claudia Zaman. However, the allegations that the Zamans are controlling persons of SB & H are sufficient. Michael Zaman and Claudia Zaman are alleged to be, respectively, the president and "a financial principal" of SB & H. The position of Michael Zaman as president of SB & H is one from which control "can be directly inferred without more." *Sloane Overseas Fund,* 941 F.Supp. at 1378. The allegation that Claudia Zaman is "a financial principal" of SB & H is sufficient as a matter of pleading, since it implies "substantial stock ownership." *Id.*

Accordingly, the primary violation claim under Section 10(b) is dismissed, whereas the Section 20(a) claim may lie.

### g. *Oppenheimer*

The only allegation in the Amended Complaint referring specifically to the sale by Oppenheimer of unregistered Scorpion stock is the allegation that "either" Green–Cohn, Westfield Financial, or Oppenheimer did so. (*See* Am. Compl. ¶ 59.) This pleading of Oppenheimer's involvement in the disjunctive fails to particularize Oppenheimer's role as required by Rules 9(b) and 12(b)(6).

Assuming *arguendo* that the Amended Complaint alleged a sale by Oppenheimer, the claim nonetheless could not stand. In Dietrich's opposition papers, he asserts that individuals at Oppenheimer apparently received bribes for their participation in the scheme. Yet there is no such allegation in the Amended Complaint, and it therefore cannot be considered in the instant motion. *See Sheppard,* 938 F.Supp. at 178; *O'Brien,* 719 F.Supp. at 229. The Amended Complaint, however, does allege that in 1991 an Oppenheimer broker received an interest-free loan from Scorpion. Although the statement regarding the bribes in the opposing papers and that of the interest-free loan in the Amended Complaint are not consistent, the allegation may give rise to an inference of fraudulent intent on part of the broker. Nonetheless, the inference is softened by the fact that the loan was purportedly made before the Regulation S scheme was allegedly conceived.

There is no allegation in the Amended Complaint that Oppenheimer helped to devise the scheme; that it knew either that Scorpion stock was issued pursuant to Regulation S or that the stock was being transferred in large blocks to foreign entities or that such transfers were a sham; that Oppenheimer was privy to inside information about Scorpion's business and alleged unlawful trading activities; that Oppenheimer dealt directly with any foreign recipient of Scorpion stock; that it executed trades in Scorpion stock on behalf of any foreign entity; that any of the foreign entities involved transferred Scorpion stock directly to Oppenheimer for sale, either prior to or immediately upon expiration of the Regulation S waiting period; or that Oppenheimer participated in the sales proceeds or received some illicit profit from the scheme.

Instead, the only allegations made against Oppenheimer in the Amended Complaint are that (1) at some time during the time period at issue it was involved (in some unparticularized fashion) in trading Scorpion common stock, *possibly* including some Scorpion Regulation S stock held at some earlier date by a foreign entity; and (2) it received commissions for the trading it did. Such allegations amount only to a description of the ordinary business of a securities broker/dealer and cannot sustain causes of action for securities fraud.

Accordingly, the Third Claim is dismissed as to Oppenheimer.

### h. *PaineWebber*

The Amended Complaint alleges that PaineWebber sold unregistered Scorpion stock. Yet it does not allege facts from which scienter on the part of PaineWebber can be inferred.

Dietrich asserts that PaineWebber was among several broker/dealers through whom the foreign entities involved sold the unregistered stock and identifies three such transactions: sales by Saturn, Wellcome Mason, and Gerard Peron. Dietrich then contends that these foreign entities sold unregistered Scorpion shares to buyers in the United States between August 1992 and April 1993. Additionally, according to Dietrich, PaineWebber was "involved" with the reissuances of a share certificate issued to Saturn. The significance of this reissuance is never explained, however, and none of the allegations imply something other than the ordinary course of a broker/dealer's business.

Unlike the claim against Green–Cohn, for example, the Amended Complaint is lacking in facts that establish motive and opportunity on PaineWebber's part in accordance with Rule 9(b). For instance, Dietrich does not allege, as he does regarding Green–Cohn and SB & H, that PaineWebber was involved in devising the Regulation S scheme or that it received a division of the proceeds from the scheme. (*See* Am. Compl. ¶¶ 49, 53.) The sole allegation regarding PaineWebber's motive is that the firm earned "substantial commissions" from trades. (Am.Compl.¶ 97(d)). This allegation, however, is made in connection with the Market Manipulation scheme and not the Regulation S scheme.

Because scienter has not been pleaded to satisfaction, the Third Claim is dismissed as to PaineWebber.

### i. *Witz*

The allegations against Witz are meager as well. According to Dietrich, Witz participated only in the Regulation S scheme (and not the Market Manipulation scheme), but the allegations against him do not describe his role or connection to the scheme. The Amended Complaint refers to Witz in three of its one hundred and ninety-three numbered paragraphs.

First, Witz "purportedly performed investment banking services for Scorpion in 1991" and allegedly "participated in orchestrating Scorpion's issuance of stock to foreign entities for ultimate sale in the United States." (Am.Compl.¶ 29.) Second, Witz, along with others, including thirteen identified persons and entities, "devised a scheme and plan to evade the registration provisions of the federal securities laws ... with the intention of causing the stock to be sold to United States purchasers ... beginning no later than May 1992." (Am.Compl.¶ 49.) Third, it is alleged that "[t]he proceeds from the sales of the stock to the public were then divided among the participants of the scheme, including [sixteen persons or entities and] Witz ...." (Am.Compl.¶ 53.)

These allegations fail to describe the nature of Witz's alleged investment banking services for Scorpion in 1991 or how such services had anything to do with Scorpion's allegedly illegal issuance of stock "beginning no later than May 1992." Additionally, they fail to identify Witz's role in the alleged scheme or when that role began or ended. As stated previously, utilization of the word "devised" is in-

sufficient under Rule 9(b). *See, e.g., Blech II*, 961 F.Supp. at 584. Moreover, Dietrich fails to identify any facts that would permit a strong inference of scienter on Witz's part. Furthermore, he fails to differentiate Witz from the other members of the Regulation S scheme.

Accordingly, the Third Claim against Witz is dismissed for failure to comply with Rule 9(b).

### j. *CS First Boston*

■ The Amended Complaint does not include CS First Boston among the Defendants who participated in the Regulation S scheme. However, Dietrich erroneously includes a Section 10(b) violation predicated on the Regulation S scheme against CS First Boston in his opposition papers. Again, these papers cannot be used as a substitute for the complaint. As CS First Boston is not alleged to have participated in the scheme, the Third Claim is dismissed as against it pursuant to Rule 12(b)(6).

### 2. *Market Manipulation Scheme*

According to Dietrich, the Market Manipulation scheme occurred during the week of January 18, through January 22, 1993. The Defendants alleged to have participated in this scheme are Green–Cohn, Cohn, Greenfield, Schwalb, Bear Stearns, CS First Boston, SB & H, Michael Zaman, and Claudia Zaman. Dietrich acknowledges that at present he has insufficient evidence to allege participation in the scheme by PaineWebber and Oppenheimer. Additionally, Witz is not mentioned in the Amended Complaint as related to this scheme.

"Manipulation is 'virtually a term of art when used in connection with securities markets.'" *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). A claim premised on market manipulation, as alleged here, focuses on the "engaged in a scheme to defraud" aspect of Section 10(b) and Rule 10b–5 and was described by the Supreme Court in *Hochfelder*. In that case, the Court defined market manipulation as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Hochfelder*, 425 U.S. at 199, 96 S.Ct. 1375.

■■ To set forth a claim for market manipulation under Section 10(b) and Rule 10b–5, a plaintiff must allege the following: (1) damage (2) caused by reliance on defendants' misrepresentations or omissions of material facts, or on a scheme by the defendants to defraud, (3) scienter (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange. *See Cowen & Co. v. Merriam*, 745 F.Supp. 925, 929 (S.D.N.Y. 1990); *Baxter v. A.R. Baron & Co., Inc.*, No. 94 Civ. 3913, 1995 WL 600720, at *5 (S.D.N.Y. Oct.12, 1995). Additionally, in order to survive a Rule 12(b)(6) motion, a plaintiff asserting a market manipulation claim must allege direct participation in a scheme to manipulate the market for securities. *See Blech II*, 961 F.Supp. at 580; *see also Green*, 430 U.S. at 476, 97 S.Ct. 1292 (stating that market manipulation under Section 10(b) "refers generally to practices, such as wash sales, matched order, or rigged prices, that are intended to mislead investors by artificially affecting market activity").

As demonstrated in the following section discussing reliance and causation, Dietrich has adequately pleaded elements (1), (2), and (4) of his claim. As set forth below, as to Green–Cohn, SB & H, and CS First Boston, he has succeeded in establishing the remaining elements.

The essence of the Market Manipulation scheme in this action is that the Defendants involved created market demand for, and artificially inflated the market price and trading volume of, Scorpion stock. The Amended Complaint alleges that the Defendants perpetrated the manipulation

by engaging in wash or matched sales and other devices to artificially increase the demand and sales volume of the Scorpion stock.

■ Before addressing the specific claims against the Defendants, it is important to keep in mind that where, as here, the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by Rule 9(b) is somewhat relaxed. *See Blech II*, 961 F.Supp. at 585; *Blech I*, 928 F.Supp. at 1290–91. Where a complaint alleges market manipulation under Section 10(b) and Rule 10b–5, more generalized allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation. See *Blech II*, 961 F.Supp. at 585; *Blech I*, 928 F.Supp. at 1290–91; *see also Securities and Exchange Comm'n v. Schiffer*, No. 97 Civ. 5853, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998) (noting that a more relaxed pleading standard exists for market manipulation claims under Rule 9(b)).

■ In *Dietrich*, it was found that:

[Dietrich's] Section 10(b) market manipulation claim, which does not depend entirely on affirmative misrepresentations, is sufficiently individualized with regard to Defendant's CS First Boston's and Green Cohn's alleged participation in a market manipulation scheme. [Dietrich] has alleged that CS First Boston and Green–Cohn engaged in matched sales and/or wash transactions between January 18 and 23, 1993 in order to artificially inflate the price and trading volume of Scorpion stock and make it appealing to investors so that when the Defendants sold Scorpion stock to the public, it could be sold for profit at an artificially inflated price. Whether ... CS First Boston and Green–Cohn purchased the stock for legitimate investment purposes, or wheth-

er [they] did so to artificially inflate the price of Scorpion stock is a question of fact that may not be resolved on a motion to dismiss.

*Dietrich*, 1996 WL 709572, at *9 (citation omitted).

As to CS First Boston and Green–Cohn, nothing in the Amended Complaint warrants any result other than that reached in *Dietrich*. The allegations of matched and/or wash transactions entered into by Green–Cohn and CS First Boston are sufficient under Section 10(b), and the controlling person allegations against Cohn and Greenfield are sufficient under Section 20(a) of the 1934 Act.

■ Similarly, Dietrich's claim against SB & H, which did not take part in the motions to dismiss the original complaint, is sufficient, as are the controlling person allegations against the Zamans.[4] According to Dietrich, as to market manipulation by SB & H, at some point during the week of January 18, through January 22, 1993, SB & H was selling in excess of one million shares. At the same time, CS First Boston was acquiring in excess of one million shares.

The Defendants oppose the sufficiency of this pleading by urging that Dietrich has not adequately alleged "wash" transactions, which have been defined as "transactions involving no change in beneficial ownership." *Hochfelder*, 425 U.S. at 205 n. 25, 96 S.Ct. 1375. They contend that Dietrich has alleged only that CS First Boston bought Scorpion stock at or about the time SB & H was selling stock; that he has not alleged that beneficial ownership of the stock remained with SB & H; that Dietrich has not alleged that the shares bought by CS First Boston and sold by SB & H were the same shares; and that he has not alleged that there was

4. The Amended Complaint's controlling person allegations are sufficient for reasons already indicated in connection with the Regu-

lation S scheme (the Third Claim) as to Cohn, Greenfield, and the Zamans.

any arrangement between CS First Boston and SB & H regarding the shares.

■ Market manipulation claims of this type, however, do not arise only out of "wash" transactions. A market manipulation claim can also be based on matched orders—"orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *Id.* Dietrich's allegations, although labeled "wash" transactions, describe matched orders by SB & H and CS First Boston.

Moreover, as stated in *Blech II,* "[a]lthough Plaintiff[ ] [has] not identified the specific securities involved in all of these trades, the allegations are sufficient to satisfy the purposes of Rule 9(b): providing defendants with notice of the charges against them, protecting a defendant's reputation from harm from unfounded allegations, and reducing strike suits." *Blech II,* 961 F.Supp. at 585. *See generally Pollack v. Laidlaw Holdings, Inc.,* No. 90 Civ. 5788, 1995 WL 261518, at \*9 (S.D.N.Y. May 3, 1995) ("Where the plaintiffs have alleged the general time frame of the communications, the person who made the statements, and the content of the statement, the inability to provide the exact dates will not defeat a claim."). Furthermore, contrary to the Defendants' contentions, as found in *Dietrich,* allegations that CS First Boston, SB & H, and Green–Cohn engaged in matched trades support an allegation that they acted with the requisite intent to defraud. *See Dietrich,* 1996 WL 709572, at \*9 (*citing Schreiber v. Burlington N., Inc.,* 472 U.S. 1, 6, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985)).

Unlike the particularized allegations of market manipulation as to CS First Boston, SB & H, and Green–Cohn, Dietrich makes no such allegations against the remaining Defendants. Without more, Dietrich's representations that Bear Stearns, PaineWebber, and Oppenheimer sold Scor-pion stock during this time period will not support a claim for market manipulation. Additionally, there are no allegations linking Dawson or Witz to the scheme. Therefore, the Fourth Claim is dismissed as to Dawson, Bear Stearns, PaineWebber, Oppenheimer, and Witz.

### B. *Transaction and Loss Causation*

■ To succeed on his Section 10(b) and Rule 10b–5 claims, Dietrich must show reliance on the Defendants' misrepresentations, thereby sustaining injury. As explained by the Second Circuit:

> The causation analysis encompasses two related, yet distinct elements—reliance and causation—elements that, in effect, correspond respectively with common law notions of "but for" and proximate causation. To satisfy the reliance element requires a showing that the violations under consideration caused the plaintiff to engage in the transaction, *i.e.,* transaction causation. To satisfy the causation element requires a showing that the violation caused the plaintiff's alleged economic loss, *i.e.,* loss causation.

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 967 F.2d 742, 747 (2d Cir.1992) (citations omitted); *see Burke v. Jacoby,* 981 F.2d 1372, 1378 (2d Cir.1992); *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985); *Ernst & Co. v. Marine Midland Bank, N.A.,* 920 F.Supp. 58, 61 (S.D.N.Y.1996).

■ As to transaction causation, "[i]n certain circumstances, a plaintiff bringing a section 10(b)/rule 10b–5 claim benefits from a rebuttable presumption of transaction causation or reliance." *Litton,* 967 F.2d at 747. One of the circumstances is where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Id.* at 748 (citing the line of cases beginning with *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968) (*en banc* ), and culminating in *Affiliated Ute Citizens v. United States,* 406

U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). "Because, in such situations, the plaintiff is unaware of the omitted information, the record generally fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted if he or she had been aware of the withheld information." *Id.*

▋ Thus to demonstrate transaction causation in a case alleging omission or nondisclosure, "actual reliance need not be shown, but a plaintiff must establish that the facts at issue were material, *i.e.,* that a reasonable investor might have considered them important in marking his investment decision." *Lazzaro v. Manber,* 701 F.Supp. 353, 364 (E.D.N.Y.1988) (*citing Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380–82 (2d Cir.1974)); *see Affiliated Ute,* 406 U.S. at 153–54, 92 S.Ct. 1456.

▋ Here, a reasonable investor might have considered as important the fact that the Scorpion stock he purchased was unregistered, or the fact that manipulation was employed to increase artificially the price and trading volume of the stock. Failure by the Defendants to disclose this information brings Dietrich's claim within the presumption of reliance. *See Litton,* 967 F.2d at 747–48; *Schlick,* 507 F.2d at 380–81.

▋ The second situation in which a rebuttable presumption of transaction causation is available is in "fraud on the market" cases.

[A] plaintiff may also, subject to rebuttal, establish transaction causation by means of the "fraud on the market" theory, which permits a plaintiff to rely on the integrity of open, well-developed markets rather than requiring proof of direct reliance on a defendant's conduct, which ordinarily would be difficult to come by given the difference between today's markets and the face-to-face transactions underlying the old common law fraud cases, in which reliance played an essential role.

*Litton,* 967 F.2d at 748; *see Blech II,* 961 F.Supp. at 586. The Amended Complaint's Third and Fourth Claims come within this presumption as well.

▋ In *Blech II,* it was found that the plaintiffs had sufficiently alleged reliance and damages for a Section 10(b) claim by alleging that they had acted in reliance on the integrity of the market for the securities at issue, and that, had they known of the fraudulent trades behind the manipulation, they would not have made their purchases. *See Blech II,* 961 F.Supp. at 582. Plaintiffs in that case also alleged that they were injured when the price of the securities that they bought fell after the collapse of the market manipulation scheme. *See id.* Here, as to the market manipulation claim, Dietrich alleges that he bought Scorpion stock in reliance on the Defendants' manipulative and deceptive devices, contrivances, schemes, and artifices and on the integrity of the market and the regulatory process.

The Defendants correctly submit that the presumption has been rebutted as to the purchases made prior to the alleged manipulation, which allegedly occurred in January 1993. Because the September 1991 and December 1992 purchases occurred prior to the alleged market manipulation, a market manipulation claim with respect to these two purchases must be dismissed. As the Defendants point out, any loss associated with these purchases could not have been caused by the market manipulation occurring after those purchases were made. *See Perez–Rubio v. Wyckoff,* 718 F.Supp. 217, 236 (S.D.N.Y. 1989) ("[A]n alleged fraud cannot be in connection with the purchase or sale of a security if the transaction occurs prior to the fraud. The alleged fraud must be prior to or contemporaneous with the securities transaction in question."); *Ernst & Co.,* 920 F.Supp. at 61 (finding that there can be no claim that the actions of the defendant formed the basis of plaintiff's action since they came after the sale at issue); *see also Crane Co. v. American*

*Standard, Inc.,* 603 F.2d 244, 252 (2d Cir. 1979) (noting that manipulative activities subsequent to the sale of stock will not support a Section 9 claim).

The claim premised on market manipulation is not lost, however, because Dietrich is also alleged to have purchased Scorpion stock in December 1993. As regarding this purchase, Dietrich has alleged that market manipulation occurred prior to this purchase of stock, that the market manipulation artificially inflated the price of the stock, and that he purchased stock which was rendered valueless by the fraudulent scheme. Therefore, Dietrich may maintain the Fourth Claim, asserting market manipulation.

As for the Regulation S scheme, Dietrich also comes within the presumption since he alleges a comprehensive fraudulent scheme perpetrated by some of the Defendants. Accordingly, Dietrich need only allege loss causation. *See Schlick,* 507 F.2d 374 (stating that proof of transaction causation is unnecessary given allegations of a comprehensive scheme to defraud in violation of Rule 10b–5); *Department of Economic Development v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1480 n. 15 (S.D.N.Y.1988) ("[A] plaintiff in a fraudulent scheme case need only show 'loss causation.'").

▉ Whereas transaction causation warrants inquiry into whether the omission or misstatement influenced the purchase, loss causation rests on whether that omission or misstatement was related to the ultimate cause of loss. The principal question here is whether the loss is a reasonably foreseeable consequence of the fraudulent actions. *See Blech II,* 961 F.Supp. at 586; *Thornock v. Kinderhill Corp.,* 712 F.Supp. 1123, 1127 (S.D.N.Y. 1989). Stated differently, the plaintiff must "show that the misstatements [or omissions] were the reason the transaction turned out to be a losing one." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994).

▉ As to both the Regulation S scheme and the Market Manipulation scheme, Dietrich alleges that, as a result of the schemes, "Plaintiff and the Class members were induced by Defendants to purchase said securities and sustained losses." (Am.Compl.¶¶ 115, 120.) Dietrich contends, as to himself, that "[a]t the times [he] bought Scorpion Common Stock, the true value of the stock was zero," that "Scorpion Common Stock currently has no market and is valueless," and that he "has not sold his Scorpion Common Stock." (Am.Compl.¶ 12.) These allegations set forth Dietrich's losses as a result of the Defendants' conduct, with a measure of damages being the difference between the price paid for the stock and the actual value of the stock. According to Dietrich, he purchased Scorpion stock, investing $2,275 in September 1991, $1,033 in December 1992, and $1,131 in December 1993, and retained the shares until the market price had fallen to zero. Dietrich has pleaded loss causation adequately.

### C. *The Third and Fourth Claims Will Not Be Dismissed on Statute of Limitation Grounds*

The statute of limitations relevant to Section 10(b) claims, 15 U.S.C. § 78i, provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i (1988); *see In re Ames Dep't Stores, Inc. Note Litig.,* 991 F.2d 968, 979 (2d Cir.1993); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Ceres Partners v. GEL Assocs.,* 918 F.2d 349 (2d Cir.1990); *Dietrich,* 1996 WL 709572, at *7.

▉ "Discovery," as the term is used in the statute, contemplates more than actual notice, but also constructive or inquiry notice. *See Menowitz v. Brown,* 991 F.2d 36, 41 (2d Cir.1993). In the

Second Circuit, the statute of limitations for securities fraud claims begins to run when the plaintiff has actual knowledge of the alleged fraud or when the plaintiff is placed on inquiry notice, to wit, when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992); *see Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350, 353 (2d Cir.1993); *Menowitz*, 991 F.2d at 41–42. The appropriate test for determining whether a plaintiff was placed on inquiry notice is "objective" in nature.

> The means of knowledge are the same thing in effect as knowledge itself. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him. This rule is fully applicable in cases ... which involve claims of securities fraud.

*Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (citations and internal quotations omitted); *see In re Integrated Resources Real Estate Limited Partnerships Sec. Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993).

█ The original complaint, filed on August 28, 1995, was dismissed in part because "[Dietrich] does not describe why or when he first became suspicious that he had been defrauded, or what steps, if any, he took to investigate the fraud." *Dietrich*, 1996 WL 709572, at *8. In response, the Amended Complaint alleges fraudulent concealment on the part of the Defendants, an allegation that "Defendants' fraudulent conduct was inherently self-concealing" in the matter of the Regulation S scheme (Am.Compl.¶ 99), and that Dietrich

> did not learn of the factual basis for his claims until March–April 1995, when

[Dietrich], through his counsel, discovered the Regulation S scheme and the related market manipulation scheme in the course of discovery in the previously filed action *In re Scorpion Technologies, Inc. Securities Litigation*, No. 93–20333–EA1, pending in the United States District Court for the Northern District of California.

(Am.Compl.¶ 100.) Evidence of "the transactions underlying the Regulation S scheme," according to Dietrich, was uncovered "in the course of preparing for and taking the depositions of principals of ... Green–Cohn," while "[Dietrich's] counsel also received an expert report analyzing Scorpion Common Stock trading that further illuminated those transactions and the market manipulation scheme alleged here." (Am.Compl.¶ 100.)

Before discussing Dietrich's fraudulent concealment allegation, it must be determined whether, as the Defendants contend, the action filed in 1993 by counsel for Dietrich in the Northern District of California, as well as press and media reports relating to that action, put Dietrich on "inquiry notice," barring the instant action as untimely. According to the Defendants, knowledge of the facts alleged in that action evidences knowledge of facts which put Dietrich, through counsel, on inquiry notice of the facts underlying the claims in the present action.

█ The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, available to the plaintiff providing him "with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]." *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 664 (1987) (citation and internal quota-

tions omitted). Of course, the triggering information must be such that it relates to the omissions and misrepresentations the plaintiff later alleges in his action against the defendants. *See Integrated Resources,* 815 F.Supp. at 639 n. 8.

Here, the complaint in the *Scorpion Technologies, Inc. Securities Litigation* action alleges a different fraud, on the part of different parties, than what is alleged in the present action. The *Scorpion Technologies, Inc. Securities Litigation* complaint alleges

> a scheme and common course of conduct to inflate the Company's earnings by, *inter alia,* including in reported earnings of the Company amounts attributable to fictitious sales of the Company's products and phony sales to third parties who paid for the software with money obtained through the sale of Scorpion's stock.

The phony sales were reportedly made in 1991, long prior to the Market Manipulation and the illegal sale of the unregistered stock, and were unrelated to either of those two schemes. Additionally, the sales were made, according to Scorpion, to entities unrelated to those later involved in the Regulation S scheme. Moreover, that complaint alleges fraud against the president and a vice president of Scorpion and Scorpion's accountant, not against any of the defendants in the present action, none of whom are mentioned in the complaint. Thus knowledge of the facts alleged in the *Scorpion Technologies, Inc. Securities Litigation* complaint would not necessarily have put Dietrich on notice of the facts underlying the claims in the present action. The same must be said of the press and media reports and press release referred to in that complaint. *See Integrated Resources,* 815 F.Supp. at 639 & n. 8.

CS First Boston nonetheless submits that either news reports of investigations concerning Scorpions' phony sales or the securities fraud class action filed in connection with that fraud were sufficient, in and of themselves, to place Dietrich on inquiry notice of the market manipulation scheme which gives rise to this action. In support of its proposition, CS First Boston cites to several cases. Yet, in each of those cases, the fraud asserted by the plaintiffs was precisely the same fraud which was the subject of the earlier investigations, media reports, or lawsuits. *See, e.g., Armstrong,* 699 F.2d 79; *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402 (2d Cir.1975); *Korwek v. Hunt,* 646 F.Supp. 953 (S.D.N.Y.). Only in *Lenz v. Associated Inns and Restaurants Co.,* 833 F.Supp. 362 (S.D.N.Y.1993), is the lawsuit unrelated to the transaction forming the basis of the action.

In *Lenz,* the plaintiff was a limited partner suing the general partners for securities fraud arising out of a failed real estate investment. Prior to Lenz's investment, certain representations were made to him by Holmes, one of the general partners. During the course of the investment, Lenz received, in writing, information that demonstrated the falsity of certain of the initial representations and showed that the investment was not performing as promised. In addition, Lenz had difficulty obtaining financial information regarding the investment from the general partners and clear responses regarding the performance of the investment. Moreover, Lenz had begun to deal with other real estate limited partnerships and his experiences therein led him to believe that the general partnership in this case had not provided him with the proper documentation for his investment. When he finally obtained financial statements of the limited partnership, Lenz voiced suspicion that the general partners were intentionally generating losses. In this context, Lenz learned that Holmes had been convicted of fraud in an unrelated transaction. *See id.* at 373–77. CS First Boston seizes on this fact and suggests that the mere awareness of this criminal fraud conviction was, by itself, sufficient to put the plaintiff on inquiry notice of the probability of fraud in the other transaction.

■ The *Lenz* opinion demonstrates, however, that the court viewed the fraud conviction as only one of many factors in ruling that the plaintiff was on inquiry notice of the fraud and had the duty to investigate. Indeed, it was recognized in that case that it is "impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud." *Id.* at 370. Notwithstanding CS First Boston's representation, there is no absolute rule in the Second Circuit that the filing of a lawsuit alleging fraud against a defendant is sufficient to place a plaintiff on inquiry notice of other fraudulent acts by the same defendant.

■ In the Amended Complaint, Dietrich alleges fraudulent concealment on the part of the Defendants that tolled the statute of limitations. Under the fraudulent concealment doctrine, in order for the statute of limitations to be tolled, the plaintiff must demonstrate with particularity wrongful concealment by the defendant, which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and due diligence in pursuing discovery of the claim. *See Butala v. Agashiwala,* 916 F.Supp. 314, 319 (S.D.N.Y.1996). With respect to the first element of the claim, wrongful concealment, "there are two general varieties": the "defendant may have taken affirmative steps to prevent the discovery of the plaintiff's injury, or the nature of the wrong itself may have been self-concealing." *Id.*

Here, Dietrich alleges that the conduct of the Defendants was self-concealing. Regardless of the type of concealment pleaded, the doctrine of fraudulent concealment will not toll the limitations period unless both fraudulent concealment and due diligence are established. *See id.*

■ Dietrich's explanation in the Amended Complaint regarding the manner in which the wrongful concealment was self-concealing is adequate. According to Dietrich,

Defendants' fraudulent conduct was inherently self-concealing. Investors in the United States buying the Scorpion Common Stock issued purportedly pursuant to Regulation S had no reason to suspect that the stock had been issued outside the United States and improperly sold in the United States without restriction. This Regulation S stock appeared no different from the other Scorpion Common Stock available on the market.

(Am.Compl.¶ 99.) Moreover, the nature of the alleged fraud rendered its discovery all the more difficult.

■ Finally, the question of whether Dietrich engaged in due diligence in pursuing his claims cannot be answered on the instant motion to dismiss. Indeed, even in the context of a summary judgment motion, this Court has noted the care that must be taken in deciding such a motion, because the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide. *See Ames Dep't Stores,* 991 F.2d at 979–81 (in reversing the grant of summary judgment on statute of limitations grounds, noting that a "reasonable juror certainly could have found that the noteholders had insufficient information to make these allegations in January"); *Sloane Overseas Fund,* 941 F.Supp. at 1374–76; *Lenz,* 833 F.Supp. at 371 (recognizing that the question of reasonable diligence is usually one of fact); *Integrated Resources,* 815 F.Supp. at 638 (same); *Dymm v. Cahill,* 730 F.Supp. 1245, 1257 (S.D.N.Y.1990) (denying motion to dismiss on statute of limitations grounds, stating that "the issue of when plaintiff's § 10(b) claim accrued under federal law ... is an issue of fact to be determined on the basis of evidence presented at a later stage in this case"); *id.* at 1254; *Intre Sport, Ltd. v. Kidder, Peabody & Co.,* 625 F.Supp. 1303, 1310 (S.D.N.Y. 1985), *aff'd without opinion,* 795 F.2d 1004 (2d Cir.1986), *vacated on other grounds,* 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987); *see also Robertson v. Seidman*

& Seidman, 609 F.2d 583, 586–93 (2d Cir. 1979). This is not to say that there exist no cases in which the applicability of the one-year limitation period by reason of inquiry notice can be determined on a motion to dismiss. See, e.g., Menowitz, 991 F.2d at 42. For instance, "[w]here the undisputed facts set forth in the complaint establish inquiry notice and the lack of due diligence, 'resolution of the issue on a motion to dismiss is appropriate.'" Butala, 916 F.Supp. at 318 (quoting Dodds, 12 F.3d at 352 n.3).

The instant pleading does not establish undisputed facts that show inquiry notice and a lack of reasonable diligence on Dietrich's part in discovering the fraud. The Amended Complaint satisfies, at this stage, the pleading requirements as to compliance with the one-year limitation period. The defect noted in Dietrich has been corrected. However, the question of whether the complaint is barred by the statute of limitations presents an issue of fact which cannot be resolved on the pleadings. It may, after relevant discovery, be an issue that could be disposed of on summary judgment.

### VI. Dietrich's RICO Claims Are Dismissed

The Fifth, Sixth, Seventh, and Eighth Claims are brought pursuant to RICO: the Fifth alleges, as to each Defendant, a conspiracy in violation of 18 U.S.C. § 1962(d) to violate § 1962(c) (See Am. Compl. ¶¶ 121–41); the Sixth alleges, as to each Defendant, the violation of § 1962(c) (See Am. Comp. ¶¶ 142–49); the Seventh alleges, as to Dawson, the Zamans, and Witz, the violation of § 1962(a) (See Am. Compl. ¶¶ 150–59); and the Eighth alleges, as to each Defendant, a conspiracy in violation of § 1962(d) to violate § 1962(a) (See Am. Compl. ¶¶ 160–64).

In Dietrich, it was held that the securities fraud claims had been pleaded inadequately. As those claims formed the basis of Dietrich's allegations of predicate acts under RICO, it was explained that the RICO claims could not lie for lack of satisfying the "two or more predicate acts" requirement. See Dietrich, 1996 WL 709572, at *10. In addition to this inadequacy, it was determined that the claim for mail and wire fraud could not lie for failure to demonstrate that the "Defendants used the mails or wires for the purpose of executing some 'scheme or artifice.'" Id. (citing 18 U.S.C. §§ 1341, 1343; Center Cadillac v. Bank Leumi Trust Co., 808 F.Supp. 213, 229 (S.D.N.Y.1992)). The court explained that "[t]he only scheme or artifice Defendants are alleged to have engaged in involves Defendants' alleged violations of the securities laws, violations which are inadequately pled." Id.

At this stage, assessment will be made as to the sufficiency of Dietrich's RICO claims against Green–Cohn, Cohn, Greenfield, SB & H, the Zamans, and CS First Boston. Because the securities fraud claims continue to be deficient as to the remaining Defendants, the RICO claims as to those Defendants fail for the same reasons articulated in Dietrich.

> Section 1962 of RICO makes it unlawful to: (1) invest income "derived from a pattern of racketeering activity" in an interstate enterprise; (b) acquire or maintain an interest or control in an enterprise "through a pattern of racketeering"; (c) participate in the conduct of an enterprise's affairs "through a pattern of racketeering"; or (d) conspire to violate any of these substantive prohibitions.

Com–Tech Assoc. v. Computer Associates Int'l, Inc., 753 F.Supp. 1078, 1087 (E.D.N.Y.1990) (quoting 18 U.S.C. § 1962), aff'd, 938 F.2d 1574 (2d Cir.1991). A private right of action is created by § 1964(c).

Dietrich's claims premised on § 1962(a), (c), and (d) fail to state a claim upon which relief can be granted.

### A. Section 1962(a)

Section 1962(a) prohibits the use or investment of income received from a

pattern of racketeering activity in the acquisition, establishment, or operation of an enterprise. *See* 18 U.S.C. § 1962(a); *Friedman v. Arizona World Nurseries Ltd.*, 730 F.Supp. 521, 549 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir.1991). Therefore, the § 1962(a) violation "is not the engaging in a pattern of racketeering activity, but rather it consists in using or investing the proceeds derived from such a pattern of activity." *Id.* In order to state a claim for civil damages under this section, "a plaintiff must allege injury from the defendants' investment of racketeering income in an enterprise." *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir.1990). A plaintiff who has suffered injury *by reason of* the predicate acts of racketeering has not necessarily been injured by the *investment* of the proceeds. *See id.* at 82–83.

■ Here, Dietrich has alleged that Scorpion and Groupe Scorpion were enterprises, within the meaning of § 1962, in which the Defendants invested a portion of the income or proceeds of income derived from a pattern of racketeering activity and, in conclusory fashion, that "Plaintiff and the Class members have been injured in their business or property by reason of Defendants' investment of the funds obtained as a result of the predicate acts, in violation of 18 U.S.C. § 1962(a)." (Am. Compl.¶ 158). The Amended Complaint, however, is devoid of "*facts* asserting injury by reason of defendants' investment of racketeering income." *Ouaknine*, 897 F.2d at 83 (emphasis added).

As Dietrich does not allege adequately any damages apart from the decline of the value of Scorpion stock, which arises out of the commission of the predicate acts rather than from an investment by the Defendants of alleged racketeering proceeds, the Seventh Claim, asserting a violation of § 1962(a), must be dismissed.

**B.** *Section 1962(c)*

To survive a motion to dismiss a civil RICO claim brought under § 1962(c), a plaintiff must adequately allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted); *see, e.g., Blech I*, 928 F.Supp. at 1288; *Palmadessa*, 874 F.Supp. at 583–84; *Scheiner v. Wallace*, 832 F.Supp. 687, 689 (S.D.N.Y.1993).

■ The RICO statute requires the plaintiff to demonstrate that each defendant was "employed or associated with [an] enterprise" and "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that a defendant could be found to have conducted or participated in the conduct of an enterprise only if it was involved in the "operation or management" of the enterprise. The *Reves* Court explained that the term "conduct," as used in § 1962(c), "requires an element of direction" and rejected the view that "almost any involvement in the affairs of an enterprise would satisfy the 'conduct or participate' requirement." *Id.* at 178, 113 S.Ct. 1163. Additionally, to "participate ... in the conduct" of the affairs of the enterprise "one must have some part in directing those affairs." *Reves*, 507 U.S. at 178, 179, 113 S.Ct. 1163; *see also United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir. 1996). The Court further surmised that liability under § 1962(c) cannot be derived from a defendant's directing its own affairs; the defendant must operate or manage the enterprise's affairs. *See Reves*, 507 U.S. at 183, 113 S.Ct. 1163. Accordingly, RICO liability may not be imposed on a defendant who merely carries on its own professional activities. Rather, the defendant's activities must relate to the conduct of the enterprise's affairs, and "some part in directing those affairs" is required. *Id.* at 179, 113 S.Ct. 1163.

■ In the instant case, Dietrich neglects to allege facts showing how any of the Defendants comes within the *Reves* test. More importantly, it is impossible to see how the Defendants could have directed, or had a part in the direction of, any enterprise as broadly defined as that alleged by Dietrich, which encompasses anybody who had anything to do with the "acquisition, financing, distribution, and sale" of Scorpion stock, identified or not. (Am.Compl.¶ 123.)

Dietrich seeks to distinguish *Reves* by referring to the Supreme Court's observation that "[a]n enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." *Reves,* 507 U.S. at 184, 113 S.Ct. 1163. However, Dietrich's supposition that the necessary direction can be satisfied by "lower-rung" participants who, in turn, are controlled by "upper management" is irrelevant to the facts of this case. The Court's observation in this regard was made in considering the question of whether low level *employees* can be held liable under RICO if they are controlled by senior management. *See id.* at 184 & n. 9, 113 S.Ct. 1163. This concept is inapplicable to the Defendants here, which are not under the control of any "upper management." Indeed, the Supreme Court held that the accounting firm defendant in *Reves* was not liable under the "upper management" theory because the accounting firm was not acting under the direction of the enterprise's upper management. *See id.* Similarly, the Amended Complaint contains no allegations that the Defendants' activities were controlled or directed by anyone.

Dietrich has failed to state any facts which support an inference that the Defendants at issue associated with each other or any other defendant for an unlawful purpose or exercised any control over each other or any other defendant. In short, the Amended Complaint lacks any allegation that those Defendants directed each other or any other defendant with regard to the trading of Scorpion stock. Accordingly, Dietrich has failed to state a claim for a violation of § 1962(c).

Furthermore, Dietrich's allegations as to the "Scorpion Stock Enterprise" do not define a cognizable RICO enterprise. The enterprise alleged "includes all persons and entities who were or are associated-in-fact in the acquisition, financing, distribution, and sale of Scorpion Stock (hereinafter 'the Scorpion Stock Enterprise')"; its members "include, but are not limited to, each of the Defendants, various brokers in the United States and offshore, and various 'investment bankers' in the United States and offshores." (Am. Compl. ¶ 123; *see also id.* ¶ 144.)

■ According to the statutory definition, " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).[5] An enterprise defined as "a group of persons associated together for a common purpose of engaging in a course of conduct" (which is what, with the addition of "entities" to "persons," Dietrich here asserts) "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see also United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir.1991).

In *Coonan,* where the proof of a RICO enterprise was challenged on appeal, the

---

5. Although the Court is not aware of a case so holding, the language of the definition appears to limit an "associated in fact" enterprise to "individuals," because it distinguishes between a "legal entity," on the one hand, and an "individual" on the other, and defines as an enterprise a "group of individuals associated in fact," 18 U.S.C. § 1961(4), not a group of individuals *and* entities, such as Dietrich here alleges. The instant decision, however, is not dependent on this point.

Second Circuit, in rejecting that challenge, cited evidence of the "enterprise's hierarchy, organization and activities," of its leadership, and of its "informal structure." *Id.* at 1560. Not only are such facts not alleged in the case at bar, but it is doubtful that the alleged agglomeration of entities and individuals encompassing everyone who had anything to do with the "acquisition, financing, distribution, and sale" of Scorpion stock could have even a minimal structure, a problem very much exacerbated by the fact that none of the individuals or entities claimed to make up the enterprise, other than the Defendants, are even identified.[6]

### C. *Section 1962(d)*

■ Dietrich's RICO conspiracy claims under § 1962(d), for violations of § 1962(a) and (c), are conclusory and insufficient. Section 1962(d) makes it unlawful to conspire to violate any of § 1962's substantive provisions. In order to plead such a conspiracy properly under § 1962(d), the plaintiff must allege that the " 'defendant himself at least agreed to commit two or more predicate crimes.' " *United States v. Teitler,* 802 F.2d 606, 613 (2d Cir.1986) (*quoting United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.1984)); *see Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25, 26 (2d Cir.1990) (*citing Rose v. Bartle,* 871 F.2d 331, 336 (3d Cir.1989) (stating that plaintiff must plead agreement to commit predicate acts and knowledge that those predicate acts were part of a pattern of racketeering activity)). "The commission of the acts is not necessary; only the agreement is required." *Friedman,* 730 F.Supp. at 548; *see Teitler,* 802 F.2d at 613.

■ " '[B]are allegations of "conspiracy" ... are insufficient to support a civil RICO claim ....' " *Morin v. Trupin,* 747 F.Supp. 1051, 1067 (S.D.N.Y.1990) (*quoting Grunwald v. Bornfreund,* 668 F.Supp.

128, 133 (E.D.N.Y.1987)). Indeed, even a "mere [allegation of an] agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 792 n. 8 (3d Cir.1984). Rather, the plaintiff is required to plead allegations that each of the defendants knowingly agreed to participate in the conspiracy, "particularly when the predicate acts alleged are fraud." *Com–Tech,* 753 F.Supp. at 1092.

■ Dismissal is warranted on the conspiracy claims because Dietrich fails to allege that each Defendant entered into an unlawful agreement. *See Hecht,* 897 F.2d at 25 ("[T]he core of a RICO civil conspiracy is an agreement to commit predicate acts, [and] a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."). Regarding § 1962(c), although Dietrich contends that each of the Defendants committed "repeated" violations constituting predicate acts, the Amended Complaint alleges only generally that the Defendants conspired to conduct the affairs of an enterprise. Such conclusory statements do not allege with sufficiency that each Defendant *personally* agreed to commit two or more of the predicate acts. *See Morin,* 747 F.Supp. at 1067 (*citing United States v. Rastelli,* 870 F.2d 822, 832 (2d Cir.1989)); *see also Hecht,* 897 F.2d at 25 & n. 4 (affirming dismissal of § 1962(d) claim which alleged simply that the defendants were "conspiring with ... others to conduct their affairs through a pattern of racketeering activity"); *Com–Tech,* 753 F.Supp. at 1092 (dismissing conspiracy claim where plaintiffs "simply incorporated by reference the allegations as to the defendants' fraudulent scheme").

Because the Amended Complaint is barren of any factual allegations demonstrating that each Defendant personally agreed

---

6. As defined by Dietrich, the Scorpion Stock Enterprise appears to include him, as well as

the class he seeks to represent.

to commit two or more predicate acts, or, as to the § 1962(a) claim, that each Defendant agreed to use or invest income received from a pattern of racketeering activity in a RICO enterprise, the Fifth and Eighth Claims, brought pursuant to § 1962(d), cannot be sustained.

## VII. *The Pendent State Law Claims*

The Amended Complaint asserts the following state law claims: the Ninth Claim sounds in common law fraud and deceit; the Tenth Claim is based on negligent misrepresentation; the Eleventh Claim alleges violation of California Corporations Code §§ 25110 and 25503, the Twelfth Claim asserts violation of §§ 25130 and 25503, the Thirteenth Claim alleges violation of §§ 25401 and 25501, and the Fourteenth Claim contends violation of § 25504.1; and the Fifteenth Claim purports a violation of California Business and Professions Code §§ 17200 *et seq.*

As a result of the dismissals directed above, the only federal question claims that remain pending are the Third Claim against Green–Cohn, Cohn, Greenfield, SB & H, Michael Zaman, and Claudia Zaman (with Cohn, Greenfield, and the Zamans as controlling persons); and the Fourth Claim against Green–Cohn, Cohn, Greenfield, SB & H, Michael Zaman, Claudia Zaman, and CS First Boston (with Cohn, Greenfield, and the Zamans as controlling persons).

Dietrich asserts federal question, but not diversity, subject matter jurisdiction. (*See* Am. Compl. ¶¶ 1–6.) The Court declines to exercise supplemental jurisdiction over the state law claims—the Ninth Claim through the Fifteenth Claim, inclusive—to the extent that they are asserted against Defendants Dawson, Bear Stearns, Oppenheimer, PaineWebber, Schwalb, and Witz, all of the federal question claims against such Defendants having been dismissed. *See* 28 U.S.C. § 1367(c)(3). Supplemental jurisdiction, however, will be ex-

ercised over Dietrich's state law claims against the Defendants remaining in this action. As to those Defendants, the motions to dismiss the pendent state law claims are granted in part and denied in part.

### A. *Common Law Fraud*

The Ninth Claim states a claim against Green–Cohn, Cohn, Greenfield, SB & H, Michael Zaman, Claudia Zaman, and CS First Boston to the extent—but only to the extent—that the Court has concluded that the Third Claim and/or the Fourth Claim, as the case may be, states a claim against those Defendants, but is otherwise dismissed.

### B. *Negligent Misrepresentation*

■ A negligent misrepresentation claim requires that the "negligent statement be 'expressed directly' by the defendant to the person relying upon the negligent statement.' " *Mabon, Nugent & Co. v. Borey,* 127 B.R. 727, 743 (S.D.N.Y.1991) (*quoting White v. Guarente,* 43 N.Y.2d 356, 362–63, 372 N.E.2d 315, 401 N.Y.S.2d 474, 478 (1977)).[7]

■ The Amended Complaint alleges that "in making the misrepresentations and omissions alleged above, Defendants acted without any reasonable grounds for believing the representations they made to be true." (Am.Compl.¶ 172.) As there is no allegation that the Defendants at issue had any direct communications with Dietrich, the negligent misrepresentation claim, or Tenth Claim for relief, cannot lie.

### C. *California Blue Sky Claims*

Dietrich's Eleventh through Fourteenth Claims for relief are based upon alleged violations of certain sections of the California Corporations Code (the "Code").

■ The Eleventh and Twelfth Claims allege violations of sections 25110, 25130,

---

**7.** Dietrich has not cited authority showing that California law, if applicable, differs from New York law, under which *Mabon, Nugent* and *White* were decided on this point.

and 25503 of the Code, which prohibit the sales of securities not registered or exempt from registration under the Code. These claims are "the California analogs to ... section 12(1) [of the Securities Act of 1933]." *Levine v. Diamanthuset, Inc.,* 722 F.Supp. 579, 589 (N.D.Cal.), *rev'd on other grounds,* 950 F.2d 1478 (9th Cir.1991). A claim under California Corporations Code § 25110 "may be brought only b[y] the purchaser of the security against the actual seller." *Commins v. Johnson & Higgins, Inc.* [1988–1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,092, at 91,-102 (N.D.Cal. Sept. 28, 1988). The Eleventh and Twelfth Claims are dismissed for the same reason as Dietrich's First Claim has been dismissed.

■■■ The Thirteenth Claim alleges violation of sections 25401 and 25501 of the Code, which prohibit the sale of a security by means of a false statement. That claim "finds its analog in section 12(2) of the [Securities Act of 1933]," *Levine,* 722 F.Supp. at 589, and liability under the Code is "limited to actual sellers." *Admiralty Fund v. Jones,* 677 F.2d 1289, 1296 (9th Cir.1982). The Thirteenth Claim is dismissed for the same reason as Dietrich's Second Claim has been dismissed.

The Fourteenth claim is based upon section 25504.1 of the Code, which creates liability for any person who "materially assists in any violation of Section 25110, 25120, 25130, 25133, or 25401 ... with intent to deceive or defraud." This claim is dismissed on the ground that the Eleventh through Thirteenth Claims have been dismissed. *See Admiralty Fund,* 677 F.2d at 1296 n. 7.

### D. *Dietrich's Claim Under the California Business and Professions Code*

■■■ The Fifteenth Claim is premised on California Business and Professions

Code §§ 17200 *et seq.,* and is, in essence, an unfair competition statute. *See Levine,* 722 F.Supp. at 590. In *Spinner Corp. v. Princeville Development Corp.,* 849 F.2d 388, 393 (9th Cir.1988), the Ninth Circuit concluded that a similar Hawaii statute did not apply to securities transactions. In the absence of citation of contrary authority, it is concluded that, were the issue presented to the highest court of California, it would reach the same conclusion as to the statute relied on by Dietrich in his Fifteenth Claim.[8]

### VIII. *Leave to Replead Will Be Denied in Part and Granted in Part*

Leave to replead is denied as to what are, in the Amended Complaint, Dietrich's First Claim, Second Claim, Third Claim, and Fourth Claim, alleging violations of federal securities laws, against all Defendants except Witz and Schwalb, to the extent that they have been dismissed. The Clerk of Court will be directed to enter judgments of dismissal with prejudice pursuant to Rule 54(b) of the Federal Rules of Civil Procedure to the extent such claims have been dismissed as indicated above.

■■■ Those claims, except as against Witz, were addressed in *Dietrich,* on the motion to dismiss the original complaint. At least where a plaintiff is on notice of deficiencies in an initial pleading and has had the opportunity to cure them by a first amendment, "dismissal with prejudice is proper when a complaint previously has been amended." *J.S. Serv. Center Corp. v. General Elec. Tech. Servs. Co.,* 937 F.Supp. 216, 225 (S.D.N.Y.1996); *see Integrated Resources,* 815 F.Supp. at 678.

■■■ As to what are, in the Amended Complaint, Dietrich's Fifth Claim through Fifteenth Claim, inclusive, alleging viola-

---

8. More than one of the Defendants have cited, on this point, *Shearson Lehman Bros, Inc. v. Greenberg,* 1995 WL 392028, 1995 U.S.App. LEX 17313 (9th Cir. July 3, 1995). That unreported decision, under the Ninth Circuit's Rules, is not precedential and thus should not have been cited.

tions of RICO and of state law, as well as the Section 10(b) and Rule 10b–5 claim against Witz, the situation is different. The Court, in *Dietrich*, did not have occasion to address the adequacy of the pleading of the RICO, to the extent herein, the state law claims, and the adequacy of the pleading as to Witz. Additionally, as to Schwalb, Dietrich may not replead an allegation of primary violation of Section 10(b). However, a control person allegation pursuant to Section 20(a) may be added as to Schwalb. Moreover, for the reason set forth above in the discussion of the statute of limitations, the discovery counsel for Dietrich has had in the case there described does not provide a reason to deny leave to replead. Dietrich may, therefore, attempt to replead, within forty-five (45) days of the date of this decision, his RICO claims against Green–Cohn, Cohn, Greenfield, SB & H, the Zamans, CS First Boston, and Witz; the Section 10(b) and Rule 10b–5 claims against Witz; a control person liability claim against Schwalb; and those of the state law claims that have been dismissed.[9]

## IX. *The Stay of Discovery*

Discovery has been stayed in this case. In light of the conclusions reached in this decision, that stay is now lifted to the extent, but only to the extent, that the service of interrogatories and requests for the production of documents or admissions is permitted. The stay remains in effect as to the taking of depositions. As to depositions, the stay will be lifted when either (1) Dietrich has repleaded any of his claims as to which leave to replead has been granted, and the Court has decided any motion under Rules 12(b)(6) and/or 9(b) directed to the repleaded claims, or (2) Dietrich's counsel advises the Court, in writing, that Dietrich will not replead any claim as to which leave to replead has been granted. The reason for the ruling as to the stay of discovery is that the successful repleading of one or more of the claims as to which leave to replead has been granted may bring into the case again defendants as to whom the case has now been dismissed in its entirety, which would then raise the possibility that depositions taken would have to be reopened.

### *Conclusion*

For the reasons set forth above, Dietrich's motion for the appointment of additional class members is denied, as is Witz' motion for reconsideration. The motions to dismiss by the Defendants are granted in part and denied in part.

Specifically, the First and Second Claims, under Section 12(1) and (2) of the 1933 Act, are dismissed with prejudice as to all Defendants; the Third Claim alleging primary violation of Section 10(b) of

---

**9.** With respect to the RICO claims, the negligent misrepresentation claim, the California state counterparts of Section 12(1) and (2), and the alleged violation of the California Business and Professions Code, the Court is not confident of Dietrich's ability to do so. Dietrich is advised to engage in an active investigation of the case law before attempting to replead these claims.

As regarding the RICO claims, for example, every claimed defect in Dietrich's pleading of those claims has not been addressed above. Yet there remain serious questions. Some examples will suffice. The mailings alleged to underlie the mail fraud predicates of the Fifth Claim do not include mailings by all of the defendants Dietrich seeks to hold liable in that claim. (*See* Am. Compl. ¶ 134.) The Sixth Claim, the Seventh Claim, and the Eighth Claim all refer to wire fraud as predi-

cates (*see* Am. Compl. ¶¶ 144, 153, 154, 155, 156, and 161), but the wire communications themselves are not alleged with even minimal particularity. In the absence of the missing allegations pointed out, the Amended Complaint does not comport with the requirements of *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176–77 (2d Cir.1993). Regarding the Sixth Claim, the Market Manipulation scheme fails to allege "closed-ended" continuity under *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), because it took place in a single five-day period. *H.J.* held that acts extending over a few weeks or months are not enough to satisfy the continuity of conduct requirement under § 1962(c). *See id.* at 240, 109 S.Ct. 2893. The examples given are not meant to be exhaustive.

the 1934 Act and Rule 10b–5, premised on the Regulation S scheme, as well as the Ninth Claim alleging common law fraud claim, are dismissed as to Dawson, Cohn, Greenfield, Schwalb, the Zamans, Bear Stearns, Oppenheimer, PaineWebber, and CS First Boston with prejudice, and as to Witz without prejudice; the Fourth Claim alleging primary violation under Section 10(b) and Rule 10b–5, based on the Market Manipulation scheme, as well as the Ninth Claim alleging common law fraud claim, are dismissed as to Dawson, Cohn, Greenfield, Schwalb, the Zamans, Bear Stearns, PaineWebber, and Oppenheimer with prejudice, and as to Witz without prejudice; the control person liability allegation under Section 20(a) is dismissed with prejudice as to Dawson; and the Fifth through Eighth Claims brought under RICO are dismissed with prejudice as to Dawson, Bear Stearns, PaineWebber, and Oppenheimer, and without prejudice as to Green–Cohn, Cohn, Greenfield, Schwalb, SB & H, the Zamans, CS First Boston, and Witz; the motions of Dawson, Bear Stearns, Oppenheimer, and PaineWebber for dismissal of the Ninth through Fifteenth Claims are granted under 28 U.S.C. § 1367(c)(3); and the Tenth through Fifteen Claims are dismissed without prejudice for failure to state a claim as to the remaining Defendants.

Dietrich is afforded forty-five (45) days to replead in accordance with this decision.

Pursuant to Rule 54(b), the Court, having determined that there is no just reason for delay in doing so, directs the Clerk of Court to enter judgment against Dietrich, dismissing:

1. First and Second Claims for Relief in the Amended Complaint with prejudice as to defendants Dawson, Green–Cohn, Cohn, Greenfield, Schwalb, CS First Boston, Bear Stearns, SB & H, Michael Zaman, Claudia Zaman, PaineWebber, Oppenheimer, and Witz.

2. Third Claim for Relief in the Amended Complaint with prejudice as to defendants Dawson, Bear Stearns, Oppen-heimer, PaineWebber, and CS First Boston.

3. Fourth Claim for Relief if the Amended Complaint with prejudice as to defendants Dawson, Bear Stearns, Paine-Webber, and Oppenheimer.

It is so ordered.